Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GLANDER INTERNATIONAL
BUNKERING INC.,

      **Plaintiff,**

      **v.**

M/V DVINA GULF, IMO NO 9336464, *et al.*,

      **Defendants.**

**Civil Action No.: 19-5206 (ES) (MAH)**

**OPINION**

**SALAS, DISTRICT JUDGE**

    Before the Court are cross-motions for summary judgment filed by Plaintiff Glander International Bunkering Inc. and Claimant Viterlef Management Co., Inc., as the claimant for *in rem* Defendant M/V Dvina Gulf (also referred to as the "Vessel"). (D.E. Nos. 49 & 50). Having considered the parties' submissions, the Court decides the matter without oral argument. Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court GRANTS in part and DENIES in part Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, and enters judgment in Plaintiff's favor.

## I.    BACKGROUND

### A.    Factual Background

    Unless noted otherwise, the following facts are not in dispute.[1] In this maritime action,

---

[1] The Court primarily pulls these facts from Plaintiff's statement of undisputed material facts (D.E. No. 50-2 ("Pl. SMF")) and Defendant's statement of undisputed material facts (D.E. No. 49-2 ("Def. SMF")). The Court also pulls facts provided in the Complaint (D.E. No. 1 ("Compl.")), Defendant's Moving Brief (D.E. No. 49-1 ("Def. Mov. Br.")), Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (D.E. No. 52-1 ("Pl. Resp. SMF")), and the deposition of Michael Cammarata dated September 23, 2020 (D.E. No. 50-6 ("Cammarata Dep.")). The Court also cites the Declaration of Nicola Ridolfi (D.E. No. 49-11 ("Ridolfi Dec.")), the Escrow Agreement dated

Plaintiff Glander International Bunkering Inc. alleges that it supplied the Vessel, M/V Dvina Gulf, with marine fuel oil (commonly called fuel bunkers) in foreign ports. (Compl. ¶¶ 5–29). Plaintiff alleges it was not paid in full and accordingly seeks to enforce a maritime lien against the Vessel under the Federal Maritime Lien Act, 46 U.S.C. § 31342(a) ("FMLA"). (*Id.* ¶¶ 12, 20, 33).

Plaintiff is a United States company in the business of providing maritime "necessaries" to ships, specifically fuel bunkers. (Pl. SMF ¶ 2). The Vessel is registered in Belize. (*Id.* ¶ 1; D.E. No. 17, Verified Answer ¶ 4). Viterlef Management Co., Inc., is the owner of the Vessel and is based in Russia. (Def. Mov. Br. at 10). On March 22, 2018, Claimant entered into an agreement, known as the "Charter," with Sea Oil Shipping Ltd. to charter the Vessel. (Pl. SMF ¶ 3). Among other terms, the Charter required Sea Oil to purchase and furnish fuel bunkers to the Vessel. (Def. SMF ¶ 4).

Accordingly, Sea Oil entered a contract with Plaintiff for fuel bunkers at the port of Rotterdam in the Netherlands. (Pl. SMF ¶ 4).[2] On May 30, 2018, Plaintiff issued a confirmation order memorializing the contract. (*Id.* ¶ 5). On June 3, 2018, Plaintiff delivered fuel bunkers in accordance with the contract and submitted an invoice in the amount of $368,786.73, which became due on July 18, 2018. (*Id.* ¶¶ 11–12; First Conf. Order; First Invoice).

Similarly, Sea Oil entered a second contract with Plaintiff for fuel bunkers at the port of Rio Grande in Brazil. (*Id.* ¶ 6). On July 20, 2018, Plaintiff issued a second confirmation order memorializing the second contract. (*Id.* ¶ 7; Second Conf. Order). On July 25, 2018, Plaintiff delivered fuel bunkers in accordance with the second contract and submitted an invoice in the

---

February 13, 2019 (D.E. No. 49-23 ("Escrow Agreement")), and the contract documents attached as exhibits to the Complaint (D.E. No. 1-2 ("First Conf. Order"), D.E. No. 1-3 ("Second Conf. Order"), D.E. No. 1-4 ("Terms"), D.E. No. 1-7 ("First Invoice") & D.E. No. 1-8 ("Second Invoice")).

[2]     Claimant describes a prior contract between Sea Oil and Plaintiff that is the subject of pending litigation in the District of Florida. (Def. SMF ¶¶ 6–8). Claimant does not provide legal authority to support the materiality of the pending litigation to the existence of a maritime lien, and the Court has not found any.

amount of $584,041.09, which became due on September 8, 2018.  (Pl. SMF ¶¶ 14–15; Second Conf. Order; Second Invoice).

Each confirmation order contains the following language: "Our General Terms and Conditions of Sale (GTCS) dated 1st of November 2017, available on our website at www.gibunkering.com and upon request, shall apply to this contract and all contracts and business undertaken by us.  Copy available on request."  (Pl. SMF ¶ 8; First Conf. Order; Second Conf. Order).  The referenced Terms provide that United States law governs the existence of a maritime lien:

> These General Terms and Conditions and each Contract to which they apply *shall be governed by the general maritime law of the United States of America* and disputes shall be determined by Arbitration in London by a sole arbitrator according to the LMAA Rules 2017. *The laws of the United States, including but not limited to the Commercial Instruments and Maritime Lien Act, shall always apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action*. In case of breach of contract by the Buyer, the Seller shall moreover be entitled to take such legal action in any court of law in any state or country which the Seller may choose and which the Seller finds relevant in order to safeguard or exercise the Seller's rights in pursuance of this present Agreement. *Seller shall be entitled to assert its rights of lien or attachment of other rights, whether in law, in equity, or otherwise, in any jurisdiction where the Vessel may be found.*

(Pl. SMF ¶ 10 (emphasis added)).

In July 2018, Sea Oil de-registered as a corporation.  (Def. Mov. Br. at 7).  In August 2018, Sea Oil made partial payment toward the balance due on the first contract; however, a balance of $134,669.51 on the first contract remains outstanding.  (Pl. SMF ¶ 13; Compl. ¶ 20).[3]  The entire

---

[3]       Claimant notes, and Plaintiff does not dispute, that upon the request of Sea Oil, Plaintiff extended its ordinary 30-day credit period to 45 days on each confirmation order.  (Def. SMF ¶¶ 11–12; Pl. Resp. SMF ¶¶ 11–12).  Claimant states that Plaintiff provided the extended credit period on the second confirmation order "[d]espite the fact that [Plaintiff] knew [Sea Oil] had failed to pay for the [first contract]."  (Def. SMF ¶ 13).  While Plaintiff, seemingly by typographical error, disputes the dates on which the contracts were delivered and became due (*see* Pl. Resp. SMF ¶ 13), according to the record, the bunker fuel was delivered pursuant to the first contract on June 3, 2018, and payment became due on July 18, 2018.  (First Conf. Order; First Invoice).  The second confirmation order was issued on July

balance of the second contract remains outstanding.  (Pl. SMF ¶ 16).[4]  Sea Oil returned the Vessel to Claimant on October 1, 2018.  (Def. Mov. Br. at 7).

Sometime in November 2018, the Vessel docked in Ravenna, Italy.  (Def. SMF ¶ 20).  On November 30, 2018, while docked in Ravenna, Plaintiff filed a Petition for the Vessel's arrest in the Court of Ravenna to obtain security for potential claims against Claimant.  (*Id.* ¶¶ 20–23; Pl. Resp. to Def. SMF ¶¶ 20–23).  Upon the filing of the Petition, Claimant learned for the first time that Sea Oil had failed to pay Plaintiff for the fuel bunkers.  (Def. Reply at 8).

On December 5, 2018, the Court of Ravenna issued an arrest order authorizing the Vessel's arrest.  (D.E. No. 49-15).  The order does not reference a maritime lien.  (*Id.*).  To obtain the Vessel's release from arrest, Claimant made a cash deposit as substitute security for the Vessel in the amount of EUR 950,000.00 at a bank in Ravenna.  (Def. SMF ¶ 25).  After the cash deposit was made, the Vessel was released on December 7, 2018.  (*Id.* ¶ 26; Pl. Resp. to Def. SMF ¶ 26).

On February 11, 2019, while the parties were still litigating the merits of the Italian arrest proceeding, Plaintiff had the Vessel re-arrested while it was docked in New Jersey.  (Compl. ¶ 2; Def. SMF ¶¶ 27–28; Pl. Resp. to Def. SMF ¶¶ 27–28; Ridolfi Dec. ¶¶ 5–15).  To obtain the Vessel's release from arrest in New Jersey, Plaintiff and Claimant entered into an escrow agreement (the "Escrow Agreement") dated February 13, 2019, which required Claimant to transfer

---

20, 2018.  (Second Conf. Order).  Notwithstanding that the second confirmation order was issued two days after the first contract became due, Claimant does not provide legal authority to support the materiality of the extended credit period, and the Court has not found any.

[4]      Claimant notes an acceleration clause in the Terms that Plaintiff "never enforced . . . despite the fact that [Sea Oil is] in default of its payment obligations."  (Def. SMF ¶ 14 (citing Terms ¶ 4(i))).  In response, Plaintiff denies that there is an acceleration clause applicable to the contracts and states that there is no obligation to accelerate payment to obtain a maritime lien against the vessel.  (Pl. Resp. SMF ¶ 14).  The portion of the Terms that Claimant cites provides that payment is generally due upon delivery unless the confirmation order, as each does here, grants a credit period, in which case Plaintiff "shall at all times be entitled to withdraw credit and demand immediate payment by giving written notice without providing reasons."  (Terms ¶ 4(h)–(i)).  This clause, by its plain language, is permissive, not compulsory.  (*See id.*).  Further, Claimant does not provide legal authority to support the materiality of the acceleration clause, and the Court has not found any.

$1,078,065.90 to the trust account of Claimant's attorney in a New York bank as substitute cash security for Plaintiff's potential claims.  (Escrow Agreement ¶ D; Def. SMF ¶ 28; Pl. Resp. SMF ¶ 28).  After this transfer, Plaintiff was to release the original cash deposit made in the bank in Ravenna.  (Def. SMF ¶ 29; Pl. Resp. SMF ¶ 29).  Claimant transferred the substitute cash security in accordance with the Escrow Agreement.  (Def. SMF ¶¶ 28 & 29; Pl. Resp. SMF ¶ 28).  On February 26, 2019, at the parties' request, the Court of Ravenna discontinued the arrest proceeding before it.  (Def. SMF ¶ 30; Pl. Resp. SMF ¶ 30).  On March 1, 2019, Plaintiff released the original cash deposit made in the Ravenna bank to Claimant in accordance with the Escrow Agreement. (*Id.*).

### B.  Procedural History

On February 11, 2019, Plaintiff filed the Complaint and ex parte motion for issuance of a warrant to arrest the Vessel in New Jersey.  (*See generally* Compl.; D.E. No. 3).  That day, the Undersigned held a conference with the parties and granted the motion for issuance of an arrest warrant.  (D.E. Nos. 8, 11 & 12).  On February 27, 2019, Claimant, as the Vessel's owner, entered a restricted appearance and verified claim of owner in this matter for the sole purpose of defending the Vessel pursuant to Rules C(6) and E(8) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.  (D.E. No. 16).  *See* Fed. R. Civ. P., Supp. Admiralty R. C(6) and E(8).  On March 20, 2019, Claimant filed a verified answer.  (D.E. No. 17).  The parties engaged in discovery, and on November 10, 2020, the Honorable Michael A. Hammer, U.S.M.J., held a settlement conference and granted the parties leave to file motions for summary judgment.  (D.E. No. 43).  On February 5, 2021, the parties filed their respective cross-motions for summary judgment (*see generally* Def. Mov. Br. & D.E. No. 50 ("Pl. Mov. Br."),

which were fully briefed in due course.  (D.E. No. 51 ("Def. Opp."); D.E. No. 52 ("Pl. Opp.");

D.E. No. 55 ("Pl. Reply"); D.E. No. 56 ("Def. Reply")).

Plaintiff seeks $718,710.60, plus interest and costs, due and owing under the fuel bunker

contracts, as well as $9,915.65 for fees and charges incurred to arrest the Vessel.  (Pl. SMF ¶¶ 17

& 19; D.E. No. 50-9, National Maritime Service Invoice).  After careful consideration of the

record, the Court is ready to rule.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial burden

of showing that no genuine issue of material fact exists.  *Celotex*, 477 U.S. at 323.  Once the

moving party has met this burden, "the nonmoving party must come forward with 'specific facts

showing that there is a genuine issue for trial.'"  *Cosm. Gallery, Inc. v. Schoeneman Corp.*, 495

F.3d 46, 51 (3d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986)).

A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The mere

existence of an alleged disputed fact is not enough.  *See id.* at 247–248.  A fact is "material" if

under the governing substantive law, a dispute about the fact might affect the outcome of the

lawsuit.  *Id.* at 248.  Factual disputes that are irrelevant or unnecessary will not preclude summary

judgment.  *See id.*

The Court must consider all facts and their reasonable inferences in the light most favorable

to the nonmoving party, *see Drumgo v. Kuschel*, 684 F. App'x 228, 230 (3d Cir. 2017), and the

procedure "is no different where there are cross-motions for summary judgment," *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   DISCUSSION

### A.   Choice-of-Law Analysis

The parties dispute which law applies to Plaintiff's claims against the Vessel.  (Pl. Mov. Br. at 4–6; Def. Opp. at 3–5; Pl. Reply at 4–6; Def. Mov. Br. at 8–11; Pl. Opp. at 10–17; Def. Reply at 10–14).  Plaintiff argues that United States law governs the existence of a maritime lien pursuant to the choice-of-law provision in the Terms because the provision automatically incorporated into the contracts.  (Pl. Mov. Br. at 4–6).  Claimant argues that the choice-of-law provision should not apply and that Plaintiff cannot benefit from the remedies available under the FMLA.  (Def. Mov. Br. at 8–11).

This being a maritime action, the parties' choice-of-law dispute begins with the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 571 (1953).  There, the Supreme Court confronted a choice-of-law issue involving a claim brought under the Jones Act for a maritime tort.  *See id.* at 573.  The claim was brought in a United States court by a Danish national who was hired in and returned to the United States.  *See id.*  The tortious conduct occurred on Cuban waters on a ship registered in Denmark and owned by a Danish national.  *See id.* at 573, 582.  Concerned that the text of the Jones Act might extend to torts with no connection to the United States, and thereby intrude on the sovereign interests of foreign nations, the Supreme Court outlined "several factors which, alone or in combination, are generally conceded to influence choice of law to govern a tort claim, particularly a maritime tort claim."  *Id.* at 583.  Those factors include (i) the place of the wrongful act; (ii) the law of the flag—that is, the nationality of the ship; (iii) the allegiance or

domicile of the injured party; (iv) the allegiance of the shipowner; (v) the place of the contract; (vi) the inaccessibility of a foreign forum; and (vii) the law of the forum. *Id.* at 583–91.

While *Lauritzen* involved a tort claim brought under the Jones Act, "the principles on which it was decided did not derive from the terms of that statute." *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959). Accordingly, "[t]he broad principles of choice of law and the applicable criteria of selection set forth in *Lauritzen* were intended to guide courts in the application of maritime law generally." *Id.*; *accord Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 181–82 (3d Cir. 1995) (en banc).

And while *Lauritzen* did not involve a choice-of-law provision to a contract, *Lauritzen* explained, when discussing the "place of contract" factor, that "if contract law is nonetheless to be considered," then "[e]xcept as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply." 345 U.S. at 588–89. As the Third Circuit has explained, the logic of this principle is as follows:

> [P]arties may generally consent to application of American law to govern their relations, as evidenced by a choice of law clause. In such cases it may be technically imprecise to speak of prescriptive jurisdiction, for American law applies not by virtue of the sovereign power of the United States but rather by the choice of the parties. However it is styled, a reasonable, mutual, ex ante choice of American law would create an American interest in applying the Jones Act or American general maritime law sufficient to meet the threshold requirement.

*Neely*, 63 F.3d at 185–86 (citations omitted).

Approaching the choice-of-law issue with the above principles in mind, the Court finds the Ninth Circuit's three-step approach instructive—particularly in the context of this case, which, like at issue before the Ninth Circuit, involves a claim for a maritime lien based on a breach of contract that contains a choice-of-law provision that was purportedly incorporated by reference:

> (1) [W]e determine the governing law with respect to contract formation [under *Lauritzen*, 345 U.S. 571]; (2) applying the controlling law, we next determine whether the contract incorporates the choice of law provision; and (3) finally, if the choice of law provision is incorporated as a term of the contract, we evaluate whether [the supplier] acquired a maritime lien for supplying fuel bunkers to the [vessel].

*Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1123–24 (9th Cir. 2008).

For a different analysis, Claimant relies on the Second Circuit's interpretation of *Lauritzen* in *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1026 (2d Cir. 1973), arguing that the Court should disregard the choice-of-law provision.  (Def. Mov. Br. at 8–11).  The Court will not do so for three reasons.  First, no other circuit court has applied the Second Circuit's approach to determine the existence of a maritime lien.  *See, e.g.*, *World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V*, 822 F.3d 766, 773 (5th Cir. 2016) ("The Second Circuit alone is arguably contrary to [the majority approach]."); Honorable Mark S. Davis & Jonathan T. Tan, *To Port or Starboard? Why the Supreme Court Might Provide Direction to Those Navigating Choice-of-Law Questions in Maritime-Lien Cases: The 2015 Nicholas J. Healy Lecture*, 46 J. Mar. L. & Com. 395, 431–32 (2015).   Second, *Rainbow Line* involved a lien sought by a third-party lender to a subsequent owner of the vessel; the third-party lender was thus far too removed from the contracting parties, as *Rainbow Line* itself recognized.  480 F.2d at 1026 n.4 ("Of course, the parties may agree between themselves that in the event of a breach, no such lien will arise, but this cannot adversely affect the rights of third persons."); *Trans-Tec Asia*, 518 F.3d at 1127 (distinguishing *Rainbow Line* on that basis).  Third, applying a choice-of-law provision is in full accord with the principles set out in *Lauritzen*.  For one, *Lauritzen* expressed concern for sovereign nations intruding on the sovereignty of others, and as the Third Circuit pointed out in *Neely*, a contractually bargained-for choice-of-law provision does not present that issue.  *See* 63 F.3d at 185–86.  For another, *Lauritzen*

noted a desire for predictability in the maritime context.  *See* 345 U.S. at 581 ("If, to serve some immediate interest, the courts of each were to exploit every such contact to the limit of its power, it is not difficult to see that a multiplicity of conflicting and overlapping burdens would blight international carriage by sea.").   And there is no greater predictability than to enforce a contractually bargained-for choice-of-law provision.  *See*, *e.g.*, *Trans-Tec Asia*, 518 F.3d at 1126 (citing Restatement (Second) of Conflict of Laws § 187(2) cmt. e (Am. L. Inst. 1971)); *see also World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 513–14 (4th Cir. 2015).  The Court will thus apply the three-step approach outlined in *Trans-Tec Asia*.

### 1.   Law Governing Contract Formation Under *Lauritzen*

The Court first discusses the *Lauritzen* factors to determine which country's law controls the issue of contract formation.  "[C]ourts should weigh and evaluate all relevant points of contact between the transaction and the sovereign legal systems that are affected by it, and not simply run through a mechanical analysis of the *Lauritzen* factors."  *Trans-Tec Asia*, 518 F.3d at 1124.  As noted above, *Lauritzen* weighs the following points of contact: (i) the place of the wrongful act; (ii) the law of the flag; (iii) the allegiance or domicile of the injured party; (iv) the allegiance of the shipowner; (v) the place of contract; (vi) the inaccessibility of a foreign forum; (vii) and the law of the forum.  345 U.S. at 583–91.

The place of the wrongful act is both the Netherlands and Brazil.  (Pl. Opp. at 16; Def. Mov. Br. at 10).  The flag of the ship is Belize.  (Pl. Opp. at 16; Def. Mov. Br. at 10; Pl. SMF ¶ 1).  Plaintiff, the injured party, is a domiciliary of the United States.  (Pl. Opp. at 16; Def. Mov. Br. at 10; Pl. SMF ¶ 2).  While the parties dispute Claimant's domicile, as either Russia or the British Virgin Islands (Def. Mov. Br. at 10; Pl. Opp. at 16), nothing turns on this dispute because the

majority of factors do not weigh in favor of either Russian or British law, as discussed below.  The Court will thus assume, as Claimant asserts, that Claimant is a domiciliary of Russia.

Contract negotiations occurred in the United States.   (Pl. Opp. at 16; Def. Mov. Br. at 11).  While Claimant argues that contract negotiation took place in both the United States *and* Anguilla, a British territory, Claimant cites no evidence in support.  (Def. Mov. Br. at 11).  Notwithstanding, nothing turns on this dispute because, even accepting Claimant's representation as true, the majority of factors weigh in favor of United States law.

Plaintiff argues that inaccessibility of a foreign forum weighs in favor of the United States because many jurisdictions do not recognize maritime liens, and the United States is one jurisdiction that does.[5]  (Pl. Opp. at 16).  Claimant argues that this factor weighs in favor of no specific nation because Plaintiff "is in no way prevented from pursuing its alleged claim in any foreign forums."  (Def. Mov. Br. at 11).  Thus, neither party argues that a foreign forum is inaccessible other than the extent to which Plaintiff notes that the United States is one of few jurisdictions that recognizes maritime liens.  *See Lauritzen*, 345 U.S. at 589–90 (discussing argument, not promulgated here, that justice required adjudication under United States law "to save seamen expense and loss of time in returning to a foreign forum").  Moreover, United States courts are available to the parties.  *See Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1247 (3d Cir. 1980) (noting that "the Venezuelan courts are available to the parties" in discussing this factor before determining Venezuelan law applied).  Finally, the law of the forum is United States law.  (Pl. Opp. at 16).

---

[5]     "[T]he United States is one of a handful of countries that recognizes a maritime lien for the provision of necessaries."  *Trans-Tec Asia,* 518 F.3d at 1123 (citing William Tetley, *Maritime Liens and Claims* 551 (2d ed. 1998)).

Weighing the *Lauritzen* factors, the Court finds that United States law applies because no other nation "boasts such substantial contacts." *See Trans-Tec Asia*, 518 F.3d at 1124–25. While the place of the wrongful act is both the Netherlands and Brazil, this factor is generally given little weight where, as here, the location of the vessel "was dictated in large part by the fortuity of the ship's location and intended route." *Gulf Trading & Transp. Co. v. M/V Tento*, 694 F.2d 1191, 1195 (9th Cir. 1982). Plaintiff is a domiciliary of the United States, and both parties agree that at least part of the contract negotiation occurred in the United States, that the United States provides a mechanism for the breach at issue, and that United States law is the law of the forum.[6] While Claimant is based in Russia, no other factor weighs in favor of applying Russian law, nor does Claimant suggest Russian law should apply. Similarly, while Claimant asserts contract negotiation took place in both the United States and a British territory, these factors do not outweigh those in favor of the United States, nor do the parties assert British law should apply. Unlike vessel owners in other maritime cases, Claimant does not, perhaps tellingly, present to this Court an alternative nation's law that has stronger ties to this matter than the United States. *See, e.g.*, *Rainbow Line*, 480 F.2d at 1026. Finally, the Vessel sailed into a United States port. *See Liverpool & London S.S. Prot. & Indem. Assoc. v. Queen of Leman*, 296 F.3d 350, 354 (5th Cir. 2002) (explaining that "there is nothing absurd about applying the law of the jurisdiction into which the ship sails, as the ship's presence in the jurisdiction represents a substantial contact"). Thus, United States law applies to the issue of contract formation.

---

[6]     The Court acknowledges, as Claimant notes, that the law of the forum is "a factor *Lauritzen* considered to be generally unimportant." *Chirinos de Alvarez*, 613 F.2d at 1247 (citing *Lauritzen*, 345 U.S. at 590–91). (Def. Mov. Br. at 11). Notwithstanding, the *Lauritzen* factors considered as a whole weigh in favor of United States law.

### 2.     Incorporation by Reference

Plaintiff argues that the choice-of-law provision is incorporated by reference into the contracts.  (Pl. Mov. Br. at 5–6).[7]  The Court agrees.  "Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together."  *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011); *see also Beacon Sales Acquisition, Inc. v. Bd. of Trs. of Teamsters Indus. Emps. Pension Fund*, 425 F. Supp. 3d 377, 390 (D.N.J. 2019); 11 Williston on Contracts § 30:25 (4th ed.) (Nov. 2021).  Moreover, federal maritime law recognizes the doctrine of incorporation by reference when a maritime contract refers to terms and conditions from a party's website.  *See, e.g.*, *One Beacon*, 648 F.3d at 267–69 (incorporating by reference the terms contained on a party's website into ship repair service contract); *New Moon Shipping Co. v. Man B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997); *Hebei Prince*, 783 F.3d at 518–19; *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31 (2d Cir. 2002).  Therefore, the contracts incorporated the United States choice-of-law provision by reference via Plaintiff's website providing the Terms.

### 3.     Giving Effect to the United States Choice-of-Law Provision

Having determined that the United States choice-of-law provision was a term of the contracts, the Court turns to Plaintiff's argument that the provision should be given effect under federal maritime law.  (Pl. Mov. Br. at 5–6).

### i.     Recognition of the Choice-of-Law Provision

Federal maritime law recognizes contractual choice-of-law provisions.  *See, e.g.*, *Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka*, 575 F.3d 409, 413 (4th Cir. 2009) (citing *M/S*

---

[7]     Claimant does not reply to Plaintiff's argument regarding incorporation by reference but rather relies on alternative grounds to argue that the maritime lien does not exist.  (*See generally* Def. Opp.).

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12–13 (1972)) ("It is well established under federal maritime law that absent a compelling reason of public policy, a freely negotiated choice-of-law clause in a maritime contract should be enforced."); *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir. 2009); *Hebei Prince*, 783 F.3d at 514 (quoting *Triton*, 575 F.3d at 415) ("'[A]bsent compelling reasons of public policy, a choice-of-law provision in a maritime contract should be enforced,' and a *Lauritzen* choice-of-law analysis [is] unnecessary."); *Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988); *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 233 (4th Cir. 2003); *Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 521 F. Supp. 3d 580, 585–86 (E.D. Pa. 2021); *Int'l Chartering Servs., Inc. v. Eagle Bulk Shipping Inc.*, 138 F. Supp. 3d 629, 640 (S.D.N.Y. 2015); *AGF Marine Aviation & Transp. v. Cassin*, 48 V.I. 720, 727 (D.V.I. Jan. 22, 2007), *amended in part*, 2007 WL 4800355 (D.V.I. Dec. 15, 2007), *aff'd*, 544 F.3d 255 (3d Cir. 2008).

The Court does "not believe the majority of circuit courts have erred legally or practically when they have found it appropriate to enforce maritime choice of U.S. law clauses, and the resultant FMLA liens, in these cases." *Bulk Juliana*, 822 F.3d at 773. "Owners of ocean-going vessels are by their nature internationally oriented, sophisticated, and fully able to protect themselves contractually in their dealings with time charterers from any perceived unfairness by the possible enforcement of maritime necessaries liens in U.S. ports." *Id.* As noted, because the Vessel sailed into a United States port, no fundamental unfairness results in enforcing the contractual United States choice-of-law provision. *See Queen of Leman*, 296 F.3d at 354. Moreover, "recognition of freely negotiated contract terms encourages predictability and certainty in the realm of international maritime transactions." *Bulk Juliana*, 822 F.3d at 773 (quoting *Trans-Tec Asia*, 518 F.3d at 1131).

Claimant cites Judge Watford's concurring opinion in *O.W. Bunker Malta, Ltd. v. M/V Trogir*, 602 F. App'x 673, 677 (9th Cir. 2015), to argue choice-of-law provisions should not be enforced against non-parties to the contract. (Def. Opp. at 4). The Court respectfully disagrees. As the Fourth Circuit has recognized, "[i]n the case of a maritime lien, the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated." *Triton*, 575 F.3d at 414 (rejecting the owner's argument that it should not be bound by the choice-of-law provision in the bunker confirmation because the owner was not a party to the supply contract). Thus, in an *in rem* action, as opposed to an *in personam* action, "the relevant inquiry is not whether the parties to the supply contract had authority to bind the [v]essel owner, but whether the parties had the authority to bind the [v]essel." *Id.* at 413–14. And Sea Oil had authority to bind the Vessel. *See, e.g.*, *id.* at 414; *see also Hebei Prince* at 514 n.3 (rejecting vessel owner's argument that it would be fundamentally unfair to apply a choice-of-law provision against a vessel owner who was not a party to that contract, noting that such an argument had already been rejected by the court in *Triton*). For that reason, there is no fundamental unfairness against Claimant in enforcing the United States contractual choice-of-law provision.

The Court therefore holds that the United States choice-of-law provision shall be enforced and governs the existence of a maritime lien.

### ii.    Application of the FMLA

Plaintiff argues that the requirements of a maritime lien under the FMLA are satisfied. (Pl. Mov. Br. at 6–10).[8] The Court agrees.

---

[8]    Rather than directly respond to this argument, Claimant relies on the argument that no maritime lien could arise under United States law because the contractual choice-of-law provision should not be enforced. (Def. Opp. at 3–5).

"[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel" and "may bring a civil action in rem to enforce the lien."  46 U.S.C. § 31342(a)(1), (2).  "The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds."  *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986); *see also Induron Corp. v. M/V Aigianis*, No. 89-0305, 1989 WL 225023, at *7 (D.N.J. Sept. 5, 1989) ("A maritime lien is a privileged claim upon property for the payment of a debt.").  "The origin of the maritime lien is the need of the ship.  The lien is given for supplies which are necessary to keep the ship going."  *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 280 (1940) (citation omitted).

Under the FMLA, "a presumption arises that one furnishing supplies to a vessel acquires a maritime lien, and the party attacking this presumption has the burden of establishing that the personal credit of the owner or charterer was solely relied upon."  *Maritrend, Inc. v. Serac & Co.*, 348 F.3d 469, 471 (5th Cir. 2003) (quoting *Equilease Corp.,* 793 F.2d at 605) (citing 46 U.S.C. § 31342(a).  "To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien."  *Equilease Corp.*, 793 F.2d at 606.

Claimant does not argue that Plaintiff intended to forego the lien.  Therefore, if the record supports that Plaintiff furnished necessaries to the Vessel, Plaintiff acquired a maritime lien.  *See id.*

First, it is well settled, and Claimant does not dispute, that fuel bunkers are necessaries.  *See Trans-Tec Asia*, 518 F.3d at 1127 n.9; *Triton*, 575 F.3d at 414 n.2; *Tomen Am., Inc. v. M/V Sava*, No. 97-4332, 1999 WL 204275, at *1 (E.D.N.Y. Apr. 7, 1999); *NuStar Energy Servs., Inc.*

*v. M/V Cosco Auckland*, No. 14-3648, 2015 WL 6457269, at *1 (S.D. Tex. Oct. 26, 2015); *Marine Oil Trading Ltd. v. Motor Tanker Paros*, 287 F. Supp. 2d 638, 641 (E.D. Va. 2003).

Second, the parties do not dispute that Plaintiff supplied bunkers to the Vessel.  (*See* Pl. SMF ¶¶ 11, 14, 18).  The record shows Plaintiff delivered fuel bunkers to the Vessel under the first contract at the Port of Rotterdam, as supported by the copy of the delivery receipt received and signed for by the Vessel.  (*Id.* ¶ 11; D.E. No. 1-5).  In addition, Plaintiff delivered fuel bunkers to the Vessel under the second contract at the Port of Rio Grande, as supported by the copy of the delivery receipt received and signed for by the Vessel.  (*See* Pl. SMF ¶ 14; D.E. No. 1-6).

Third, Sea Oil, as charterer of the Vessel, was authorized to bind the Vessel.  *See* 46 U.S.C. § 31341(a).  "It is a fundamental tenet of maritime law that '[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries.'"  *Triton*, 575 F.3d at 414 (alteration in original) (quoting *Trans-Tec Asia*, 518 F.3d at 1127–28); *see also Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1245 (11th Cir. 1999).

Therefore, Plaintiff has established that it provided necessaries to the Vessel pursuant to the contracts entered with a party authorized to act on behalf of the Vessel.  *See* 46 U.S.C. § 31342.  Accordingly, Plaintiff has legally acquired a maritime lien.

### B.  Validity of the Arrest

Claimant asks the Court to vacate the arrest of the Vessel in New Jersey because it argues the Italian arrest proceeding extinguished any maritime lien.  (Def. Mov. Br. at 5–6).  Citing Italian law, *Belcher Co. of Alabama v. M/V Maratha Mariner*, 724 F.2d 1161 (5th Cir. 1984) and *Monjasa A/S v. M/V Peristil*, No. 12-1489, 2013 WL 2932680 (D. Or. June 12, 2013), Plaintiff responds that the arrest in the Italian proceeding was an attachment pursuant to an *in personam* action against Claimant, rather than an *in rem* action against the Vessel that may have extinguished the maritime

lien.  (Pl. Opp. at 3).  For the following reasons, the Court determines that the Italian proceeding did not extinguish the maritime lien.

An *in rem* action is an action against the named property itself, *see Ventura Packers, Inc. v. F/V Jeanine Kathleen,* 424 F.3d 852, 858 (9th Cir. 2005), whereas an *in personam* action is based on personal liability (for instance, against the vessel owner), *see Belcher,* 724 F.2d at 1165. Similar to an *in rem* arrest, an *in personam* maritime action may be commenced by seizing property of the defendant and authorizing the attachment or garnishment of that property.  *See* Fed. R. Civ. P., Supp. Admiralty R. B(1).  "The substitute security does not discharge a lien in an *in personam* proceeding as it does in an *in rem* proceeding because the basis of an *in personam* action is personal liability rather than the liability of the arrested property."  *Monjasa*, 2013 WL 2932680, at \*8–9; *see also Belcher,* 724 F.2d at 1165 ("Attachment does in many respects resemble arrest. In each proceeding the vessel is seized and it may later be sold to satisfy a judgment.  In each, the vessel itself may be released and other security substituted.").

For the New Jersey arrest of the Vessel *in rem* to provide a basis to enforce the maritime lien, it must have been "premised on the existence of a valid maritime lien at the time that the action was filed."  *Petroleos Mexicanos Refinacion v. M/T King A*, 554 F.3d 99, 102 (3d Cir. 2009) (citing Fed. R. Civ. P., Supp. Admiralty R. C(1)(a)).  This is because when substitute security is provided to release a vessel from arrest in an *in rem* action, the security "becomes a complete substitute for the *res* and the maritime lien transfers from the vessel to the [security]."  *Id.* at 104. Once the vessel is released following arrest, "[t]he lien against the ship is discharged for all purposes and the ship cannot again be libeled *in rem* for the same claim."  Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 9-89, 799 (2d ed. 1975) (footnote omitted).  To determine whether Plaintiff's maritime lien was extinguished in the Italian proceeding, the Court must

determine whether the Italian proceeding invoked a maritime lien against the Vessel. *See Monjasa*, 2013 WL 2932680, at *9.

Although it does not appear that the Third Circuit has determined the effect of a prior action in a foreign jurisdiction on a maritime lien arising under United States law, "other courts have looked to the law of the foreign jurisdiction as a threshold matter to determine whether the plaintiff's maritime lien was invoked in the earlier proceedings." *Id.* at *9 (citing *Belcher*, 724 F.2d at 1164). In addition, courts consider both whether the practical effect of the previous arrest was to extinguish any maritime lien and any hardship on the vessel owner in defending two actions, or, put differently, the possibility of double recovery. *See Belcher*, 724 F.2d at 1164–65 (citing *Gulf and Southern Terminal Corp. v. S.S. President Roxas,* 701 F.2d 1110 (4th Cir. 1983) (holding judicial sale of vessel in Mexican bankruptcy action was sufficiently similar in effect to American *in rem* action to remove lien on vessel even though Mexican law does not provide for *in rem* proceedings)). Indeed, although release of the vessel from attachment pursuant to claims *in personam* transfers any lien from the vessel to the funds posted as security, "[t]his does not imply that release from an attachment likewise clears the lien," as would, for example, an execution sale or a judicial sale in admiralty. *Id.* at 1165.

In *Monjasa*, a case with similar facts, the court first acknowledged that the law of the foreign previous arrest, India, did not recognize a maritime lien, and then considered the Indian arrest order "to determine the purpose and effect of the seizure." 2013 WL 2932680, at *11. The court focused on the India arrest order's reference to the plaintiff's claim for "necessaries," which did not give rise to a maritime lien under India law, and the absence of any mention of United States maritime law or a maritime lien. *See id.* In *Praxis Energy Agents Pte Ltd v. M/V Pebble Beach*, 344 F. Supp. 3d 772, 780–81 (D. Del. 2018), another analogous case, the court similarly

considered the foreign court's holding in determining the effect of the previous arrest.  There, the previous arrest took place in Brazil, which recognized maritime liens.  *Id.* at 780.  The court reasoned that although the plaintiff originally brought the action *in personam*, the Brazilian court converted it into an action *in rem* by holding that the plaintiff had no *quasi in rem* claim under Brazil law, thereby, the court understood, "ultimately conclud[ing] that the Brazilian Action was one *in rem* rather than *quasi in rem*."  *Id.* at 779–81 (finding no valid maritime lien existed under United States law because the lien was invoked by the previous arrest in Brazil).

Under Italian law,[9] an action against a vessel may be brought in the form of an arrest to prevent the asset from being disposed of during the time of the proceeding while the creditor's rights are ascertained.  (Batini Dec. ¶ 17).  The arrest is directed against the owner of the asset, so as to take the form of an action *in personam*.  (*Id.* ¶ 18).  Moreover, a maritime lien cannot be created by the allegations contained in the arrest petition but rather by the law of the vessel's flag, which here is Belize and which, Claimant alleges, recognizes maritime liens.  (Batini Dec. ¶¶ 16 & 20; D.E. No. 49-20 ¶ 3).

Applying this understanding of Italian law, the Court finds that the Italian proceeding did not invoke the maritime lien.  The seizure of the Vessel occurred pursuant to the order issued by the Court of Ravenna (D.E. No. 49-15), regardless of Plaintiff's allegations in the Petition (Batini Dec. ¶ 16).  *See Monjasa*, 2013 WL 2932680, at *11.  The order authorized the arrest of the vessel "*against the owners . . .* as guarantee for the applicants' claim up to the amount of EUR 950,000."

---

[9]     "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  "Rule 44.1 gives the court wide latitude in determining foreign law."  *Monjasa*, 2013 WL 2932680, at *10 (citing Thomas Schoenbaum, *Admiralty & Mar. Law* § 9–8, n.26 (5th ed. 2012).  "The existence of a right to a lien under foreign law can be proved in several different ways, such as through an affidavit by a foreign legal expert or through an authoritative legal treatise or law review article."  *Id.* at *10 (quoting Schoenbaum § 9–8, n.26).  Accordingly, the analysis of the effect of the arrest of the Vessel in Italy is guided by the Declaration of Nicola Ridolfi and the Declaration of Alberto Batini (D.E. No. 52-3 ("Batini Dec.")).

(D.E. No. 49-15 (emphasis added)); *see also* Batini Dec. ¶ 19 ("The order binds only the Master (and Owners), not the Vessel itself, nor [is] the Vessel [] otherwise regarded as a party of the proceedings . . . other than being a property of the debtor subject to attachment as security for the creditor's rights."). The order makes no reference to the existence of a maritime lien, under either United States law or Belize law. (D.E. No. 49-15). *See Monjasa*, 2013 WL 2932680, at *11; *see also Praxis*, 344 F. Supp. at 781. In addition, the parties entered into the Escrow Agreement for purposes of transferring the original security in connection with the Italian proceeding into a trust account in connection with the instant proceeding. (Escrow Agreement ¶ D; Def. SMF ¶ 28; Pl. Resp. SMF ¶ 28). The parties voluntarily dismissed the Italian proceeding while they were still litigating the merits of the arrest and before the Italian court issued a decision or ordered any sale of the Vessel. (Def. Reply at 5 n.3; Def. SMF ¶¶ 27–28; Pl. Resp. SMF ¶¶ 27–28; Ridolfi Dec. ¶¶ 5–15). And, in accordance with the terms of the Escrow Agreement, the original security was returned to Claimant within three days of voluntarily dismissing the Italian action. (Def. SMF ¶ 30; Pl. Resp. SMF ¶ 30). Accordingly, the Court does not find any possibility of double recovery or hardship imposed on Claimant by the instant action. *See Belcher*, 724 F.2d at 1165–66 (finding no hardship to vessel owner where United States proceedings could be stayed while foreign action was adjudicated, thereby averting possibility of double recovery).

Finally, the Court rejects Claimant's argument that the maritime lien is extinguished because Plaintiff did not have valid *in personam* claims against Claimant in the Italian proceeding. (Def. Reply at 1–3). The merits of the Italian proceeding are not before this Court. *See Monjasa*, 2013 WL 2932680, at *12 (rejecting defendants' argument that initial arrest extinguished maritime lien because plaintiff did not have valid *in personam* claim, noting "[t]he effect of [the] India proceedings is the issue before the Court rather than the validity of the claim asserted").

21

### C. Laches

Claimant alternatively argues that the doctrine of laches extinguished any maritime lien that exists because it was prejudiced by the fact that Sea Oil de-registered as a corporation in July 2018. (Def. Mov. Br. at 6–8).   In response, Plaintiff argues it was diligent in seeking to enforce its lien rights, and thus Claimant fails to meet its burden to show the applicability of the laches defense. (Pl. Opp. at 5–8).  The Court agrees with Plaintiff.

Sea Oil returned the Vessel to Claimant on October 1, 2018.  (Def. Mov. Br. at 7).  Claimant asserts it first learned Sea Oil had failed to pay for the bunker fuel on November 30, 2018, when Plaintiff sought arrest of the Vessel in Italy.  (*Id.*).   Therefore, Claimant argues, it was unable to exercise its right to lien cargo loaded aboard the Vessel for any sums due under the Charter between it and Sea Oil before the Vessel was returned in October.  (*See id.*; *see also* D.E. No. 49-4, Charter Agreement ¶ 31).

"[A] person asserting a maritime lien on a chartered vessel is obliged to move promptly, so that the owner may effectively pursue his rights of indemnification against the charterer." *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 196–97 (2d Cir. 2018) (quoting *United States v. S.S. Lucie Schulte*, 343 F.2d 897, 901 n.3 (2d Cir. 1965)).   Because there is no federal statute of limitations for maritime lien claims, the doctrine of laches is a procedural defense to delay in the enforcement of a maritime lien.  *See Bermuda Express, N.V. v. M/V Litsa*, 872 F.2d 554, 558 (3d Cir. 1989).  "Laches consists of inexcusable delay in instituting a suit coupled with prejudice to the party against whom the claim is asserted."  *Westvaco Worldwide Corp. v. M/V Niger Basin*, No. 88-0621, 1989 WL 51714, at *2 (E.D. Pa. May 11, 1989) (citing *Loverich v. Warner Co.*, 118 F.2d 690, 693 (3d Cir. 1941)).   The party seeking to enforce a maritime lien is held to a "reasonable diligence" standard. *Bermuda Exp.*, 872 F.2d at 558.  "[T]he conclusion that

a delay is 'inexcusable' comprehends both the application of a legal standard and an exercise of the trial court's sound discretion in assessing the equitable circumstances of a particular case." *Churma v. U.S. Steel Corp.,* 514 F.2d 589, 593 (3d Cir. 1975).

"As a general rule, in deciding whether maritime claims are barred by laches, courts of admiralty use local limitations statutes as rules-of-thumb concerning the presence of prejudice or excusable delay." *Conty v. States Marine Lines, Inc.*, 355 F.2d 26, 27 (2d Cir. 1966). "If the most closely analogous state statute of limitations has not run, the presumption of laches does not attach and the defendant bears the burden of proving the defense." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 746 (2d Cir. 2016). Plaintiff points to the New Jersey Construction Lien Law as the most analogous state statute, which provides that a lien claimant must file a lawsuit seeking to enforce its lien within one year of the date of its last provision of work. (Pl. Opp. at 6 (citing N.J. Stat. Ann. § 2A:44A-24.1(a)). Here, each contract became due on July 18, 2018, and September 8, 2018, respectively. (Pl. SMF ¶ 11–12 & 14–15; First Order Conf.; First Invoice; Second Order Conf.; Second Invoice). Claimant maintains it received notice of Plaintiff's claims on November 30, 2018, when Plaintiff sought the arrest of the Vessel in Italy. (Def. Reply at 8). Therefore, Claimant received notice of Plaintiff's claims within the analogous one-year statute of limitations and bears the burden of proving laches. *See Sojuzplodoimport*, 809 F.3d at 746.

First, the Court does not find Plaintiff unreasonably delayed seeking enforcement of the lien within approximately five and three months after each contract became due, respectively. *See Bermuda Express*, 872 F.2d at 559; *see also Kristensons-Petroleum, Inc. v. Sealock Tanker Co.*, No. 02-9222, 2005 WL 735940, at *2 (S.D.N.Y. Mar. 30, 2005), *aff'd sub nom. Kristenson-Petroleum, Inc. v. Blanc Navigation, Sealock Tanker, Co.*, No. 05-2230, 2005 WL 2899868 (2d

Cir. Nov. 3, 2005) (striking laches defense regarding arrest of vessel more than four years after lien arose, finding that "[a]s a matter of common sense, it is not unreasonable for a party to wait until it has some hope of recovery before it files suit").  Further, Plaintiff's efforts to resolve its claims before arresting the Vessel, which resulted in partial payments received from Sea Oil in August 2018 (Pl. SMF ¶ 13; Pl. Opp. at 9), far from exhibit unreasonable delay and are consistent with the preferred method of arrest as a remedy of last resort.  *See Bermuda Express*, 872 F.2d at 559 (noting "[t]he arrest of a vessel is a remedy of last resort . . . one which has the potential to seriously disrupt the flow of maritime commerce" and "declin[ing] to establish a firm rule which would require a maritime lienor to arrest a vessel, particularly if there are available other reasonable methods, consistent with industry custom, to secure payment"); *see also Galehead, Inc. v. M/V Negril Bay*, No. CIV. A. 99-0213, 1999 WL 397950, at *3 (E.D. La. June 14, 1999) ("The plaintiff should not be faulted for not arresting the ship before it left the United States in March 1994, less than six months after the services were provided, because the arrest of a vessel is a remedy of last resort."); *Gammill v. Bradley T*, 879 F. Supp. 737, 741 (W.D. Ky. 1995) ("where other reasonable means are available to pursue payment, it makes no sense to require a plaintiff to seek the most aggressive and debilitating method").

Second, the Court does not find that Claimant meets its burden to show prejudice.  Claimant relies on *Leopard Marine*, a case distinguishable on its facts.  (Def. Reply at 8).  In *Leopard Marine*, the fuel supplier notified the vessel owner about sums due for unpaid fuel provided to the vessel's charterer approximately two years after both the bill became due and the charterer declared bankruptcy, and sought to enforce a maritime lien against the vessel approximately five years after the bill became due.   896 F.3d at 179, 197–99 (holding such delay significantly prejudiced the vessel owner by eliminating its opportunity to exercise its contractual remedies against the

24

charterer).  Here, the Plaintiff made no such inexcusable delay in seeking the vessel's arrest and thereby notifying Claimant as to the sums due.

For those reasons, the doctrine of latches does not extinguish the maritime line.

### D.  Costs

Plaintiff submits that it has incurred costs in the amount of no less than $9,915.65 in arresting the Vessel in New Jersey pursuant to 28 U.S.C. §§ 1920 and 1921(a).[10]  (Pl. SMF ¶ 19; Pl. Mov. Br. at 10; D.E. No. 50-9, National Maritime Service Invoice).  Claimant does not dispute Plaintiff's entitlement to costs, nor does it dispute Plaintiff's submitted proof of costs. Accordingly, the Court awards Plaintiff costs in the amount of $9,915.65.

Plaintiff also seeks prejudgment interest from the date of filing of the Complaint, February 11, 2019.  "The rule in admiralty is that 'prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable.'"  *Matter of Bankers Trust Co.*, 658 F.2d 103, 108 (3d Cir. 1981).  However, Plaintiff did not submit information on the

---

[10]     28 U.S.C. § 1920(1) provides that "[a] judge or clerk of any court of the United States may tax as costs . . . [f]ees of the clerk and marshal . . . ."  And under 28 U.S.C. § 1921(a)(1), "[t]he United States marshals or deputy marshals shall routinely collect, and a court may tax as costs, fees for the following":

> (A) Serving a writ of possession, partition, execution, attachment in rem, or libel in admiralty, warrant, attachment, summons, complaints, or any other writ, order or process in any case or proceeding.
> (B) Serving a subpoena or summons for a witness or appraiser.
> (C) Forwarding any writ, order, or process to another judicial district for service.
> (D) The preparation of any notice of sale, proclamation in admiralty, or other public notice or bill of sale.
> (E) The keeping of attached property (including boats, vessels, or other property attached or libeled), actual expenses incurred, such as storage, moving, boat hire, or other special transportation, watchmen's or keepers' fees, insurance, and an hourly rate, including overtime, for each deputy marshal required for special services, such as guarding, inventorying, and moving.
> (F) Copies of writs or other papers furnished at the request of any party.
> (G) Necessary travel in serving or endeavoring to serve any process, writ, or order, except in the District of Columbia, with mileage to be computed from the place where service is returnable to the place of service or endeavor.
> (H) Overtime expenses incurred by deputy marshals in the course of serving or executing civil process.

amount or rate of prejudgment interest to be awarded.  Accordingly, the Court denies Plaintiff's request for prejudgment interest without prejudice.  Plaintiff may move separately for such an award.

## IV.    CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part Plaintiff's motion, DENIES Defendant's motion, and enters judgment in Plaintiff's favor.  An appropriate Order follows.

Date: March 29, 2022                                      */s/ Esther Salas*
                                                         Esther Salas, U.S.D.J.